UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
DOCKET NO. 3:13-cr-00293-MOC-DCK

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| Vs. | ) | ORDER |
| | ) | |
| **JERONZA THORNE,** | ) | |
| Defendant. | ) | |

**THIS MATTER** is before the court on defendant Jeronza Thorne's Motion to Dismiss Based on Outrageous Government Conduct, in which his co-defendants have joined. A hearing was conducted on such motion on September 15, 2014. Subsequent to the hearing, Defendants Hill and McCrory entered pleas that did not preserve the issue raised in the instant motion.

Asserting a violation of general due process under the Fifth Amendment, Defendant Thorne contends that the law enforcement conduct at issue here was either unlawful or so outrageous as to violate the Due Process protections afforded under the Fifth Amendment to the United States Constitution. Specifically, he contends that it was outrageous for the government to target him in a sting operation having little connection to his past criminal history and in not opposing his release on bond on a Supervised Release Violation ("SRV"), which is also before this court. Recognizing the distinction between putting on an entrapment defense at trial and seeking to have the charges against him dismissed for a violation of the Due Process clause, the court conducted a two-day evidentiary hearing in advance of trial and provisionally ruled that defendant's Motion to Dismiss Based on Outrageous Government Conduct was without merit. Defendant requested that the court

1

reduce its ruling to writing. Having fully considered defendant's arguments and the evidence presented, the court now reaffirms its initial determination and denies defendant's motion.

I.

While first alluded to in Rochin v. California, 342 U.S. 165 (1952), the theory of "outrageous government conduct" has its origins in United States v. Russell, 411 U.S. 423 (1973), the Supreme Court's seminal decision applying a subjective standard to the entrapment defense. In the majority opinion in Russell, then Associate Justice William H. Rehnquist, while affirming the subjective standard for entrapment, discussed the theoretical possibility of government conduct so outrageous as to bar resort to judicial process:

> While we may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction, *cf. Rochin v. California*, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952), the instant case is distinctly not of that breed.… The law enforcement conduct here stops far short of violating that 'fundamental fairness, shocking to the universal sense of justice,' mandated by the Due Process Clause of the Fifth Amendment. *Kinsella v. United States ex rel. Singleton*, 361 U.S. 234, 246, 80 S.Ct. 297, 304, 4 L.Ed.2d 268 (1960).

Id. at 431-32. Three years later, the Court and Justice Rehnquist backed away from development of a freestanding exclusionary rule for "outrageous government conduct," holding that defendants must show a specific violation of a constitutional right or Due Process. Hampton v. United States, 452 U.S. 484 (1976).

Post-Hampton, the law concerning dismissal for outrageous government conduct has developed circuit-by-circuit. While trial courts within the Ninth Circuit have recently found outrageous government conduct in so-called "stash house robbery stings" conducted by the ATF, see United States v. Roberts, 2:13CR 751 (C.D.Cal. May 30, 2014) and United States v. Hudson,

2014 WL 960860 (C.D.Cal. March 10, 2014),[1] the law remains clear in the Fourth Circuit that "'outrageous conduct' doctrine survives in theory, but is highly circumscribed." United States v. Hasan, 718 F.3d 338, 343 (4th Cir. 2013).  In the years between Hampton and Hasan, the Fourth Circuit has consistently held that a due process violation may only be found when the conduct at issue "is outrageous, not merely offensive." United States v. Goodwin, 854 F.2d 33, 37 (4th Cir. 1988).

While the trial courts in California clearly found arbitrariness in the scenarios created by the ATF, see Hudson, 2014 WL at 11, in this circuit the government conduct must "shock the conscience of the court." United States v. Osborne, 935 F.2d 32, 36 (4th Cir.1991). While the "touchstone of due process is protection of the individual against arbitrary action of the government," County of Sacramento v. Lewis, 523 U.S. 833, 845 (1998), it is only "the most egregious official conduct" that will qualify as constitutionally arbitrary in the Fourth Circuit. Huggins v. Prince George's Cnty., Md., 683 F.3d 525, 535 (4th Cir.2012) (quoting Lewis, 523 U.S. at 846).  In determining whether governmental conduct was arbitrary,

> [t]here are no mechanical tests for deciding when [government action] is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge ….

---

[1] In finding outrageous government conduct in a similar stash house case, the district court there held, as follows:
> In these stash-house cases, the Government's "participation in the offense conduct" is what makes them particularly repugnant to the Constitution. Everything about the scheme—and therefore almost everything bearing upon a defendant's ultimate sentence—hinges solely on the Government's whim. Why were there not 10 kilograms in the stash house? Or 100? Or 1,000? Why were the guards allegedly armed—necessitating that Defendants bring weapons along with them? All of these factors came down to the ATF and the undercover agent alone. That sort of arbitrariness offends the Constitution's due-process demands.

*Hudson*, 2014 WL at 11.

3

Ungar v. Sarafite, 376 U.S. 575, 589-590 (1964) (addressing arbitrariness in denying a continuance). The standard which must be applied *here* in determining whether government conduct is so outrageous as to offend Due Process is whether the conduct is "shocking" or "offensive to traditional notions of fundamental fairness." Osborne, 935 F.2d at 37.

Most recently, in Hasan, supra, the Court of Appeals held that "[o]utrageous is not a label properly applied to conduct because it is a sting or reverse sting operation involving contraband." Id. at 344.[2] As observed by Honorable T. S. Ellis, United States District Judge, in the opinion underlying the appellate court's decision in Hasan,

> such due process violations are quite rare. Indeed, the Fourth Circuit has considered the issue on several occasions and has yet to reverse a single conviction or suppress evidence based on allegations of outrageous government conduct. And this is not surprising, for a due process violation such as the one alleged here can be found "only where the official [government] conduct is outrageous, not simply offensive."

United States v. Hasan, 846 F.Supp.2d 541, 545 (E.D.Va. 2012) (footnote and citation omitted). With that standard firmly in place, when and if outrageous government conduct is shown, the appropriate remedy would, as defendant suggests, be dismissal prior to trial.

II.

Applying the Fourth Circuit standard to the facts presented at the hearing, the conscience of the court is not shocked. Defendant has raised a number of concerns about the sting operation, from its inception to his arrest and comments made by the magistrate judge at his initial appearance. While he takes issues with every step or aspect of the operation, and all those arguments have been taken into consideration, the court will highlight and address defendant's key contentions.

---

[2] The Court of Appeals for the Fourth Circuit has also recently held, albeit in an unpublished decision, that there is a "high shock threshold" when a defendant makes a claim of outrageous government conduct. *United States v. Erwin*, 520 F. App'x 179, 180, 2013 WL 1800404, *1 (4th Cir. April 30, 2013).

4

A.

First, the defendant finds shocking the fact that the government agreed to his release from custody on the SRV so that he could participate in the sting. As with any target of an investigation, the question is not his custodial status (as it is well known that serious crimes, including *Hobbs Act* crimes, can be orchestrated from the Mecklenburg County jail),[3] but whether the government had a reasonable belief that such defendant had a predisposition to participate in such criminal activity. At the hearing, counsel for the defendant "defied" the court to find another reported example of where the government agreed to the release of an individual so that he could participate as the target in a sting operation; while the court could not find a reported case dealing with the release of a defendant as a target, it is routine for the government to seek the release of cooperating individuals, even hardened criminals, to participate in investigations and stings. To hold -- as defendant's argument suggests -- that the outer limits of acceptable law enforcement techniques are activities previously presented and approved by courts would, in essence, mean that there would be no acceptable law enforcement techniques. It is the adversarial process -- such as that engaged in by arguing and reviewing the present motion -- that creates case law. Just as crime and criminal enterprises evolve, so must law enforcement techniques. The role of the court is not to impose its subjective beliefs as to what may or may not be an "offensive" law enforcement practice, as that, as it must, will vary judge-to-judge. Instead, the standard is not what offends the judge, but what practices offend the Constitution. That inquiry pivots on whether the practice is "offensive to traditional notions of fundamental fairness." Osborne, 935 F.2d at 37. Traditional notions of fairness are not offended where the government does not oppose detention or even agrees to the release of a person that is the target of a sting operation.

---

[3] *See United States v. Osman White*, et al., 3;12cr13 (WDNC 2012).

5

B.

Second, defendant has called into question the affidavit used before the magistrate judge in securing a warrant for his arrest on the Complaint underlying this indictment. He contends that the confidential informant was not a *reliable* informant because the informant had been arrested on offenses while working for the ATF, that the informant had prior convictions, and that the informant used marijuana while employed by the ATF. Motion to Dismiss (#74) at 2-3. Defendant contends that it was violation of Due Process for the government to fail to disclose such facts to the court. Id. at 3. First, the court has conducted *an in camera* review of information concerning the identity of the confidential informant as well as the criminal record of such informant. Second, the court has looked at the resulting convictions that were obtained based on information provided by such source. The source has provided information that has consistently resulted in convictions. Third, and perhaps most importantly, the reliability of a source is not determined by the criminal history of the informant or the criminal conduct of the informant while being paid by the government. If only those without involvement in crime or bad conduct were eligible to be in the pool of confidential informants, that pool would certainly be full; however, there would be little activity of interest to law enforcement as people who lead lawful and productive lives fortunately have little contact with the criminal element. Reliability of an informant is not based on that person's criminal proclivity, but on the accuracy of information that person has provided law enforcement in the past. United States v. Christmas, 222 F.3d 141, 144 (4th Cir. 2000). Indeed, it is corroboration of salient facts provided by the informant that demonstrates veracity. Alabama v. White, 496 U.S. 325, 331–32 (1990); United States v. Lalor, 996 F.2d 1578, 1581 (4th Cir.1993) (holding that, pursuant to Gates, confirmation of "innocent details" provided by the informant, which included the defendant's "address, vehicle, and alias[,]

gives credence to the allegations of criminal activity"). Here, the affidavit submitted by the government to the magistrate judge in support of the warrant does *precisely* what is required by White and Lalor, as the affiant avers that not only has the informant provided reliable information in the past, the details of the information provided as to this defendant were corroborated through another individual not associated with the informant. See King Aff. at ¶ 4 (Def. Ex. 2 (#74-2) at 2). There is no merit to defendant's contention that the government based its application for a warrant on information from an unreliable source.

C.

Third, defendant takes issue with the government's failure to oppose his release on bond when he initially appeared on the SRV. When defendant appeared with counsel for a bond hearing on the SRV offense, defendant's attorney moved for his release, which the government did not oppose. Defendant appears to argue that it was outrageous for the government to allow him to be released in circumstances where it would normally seek detention without informing the court of its underlying reasons for not opposing release. The court knows of no obligation on the executive to oppose release under circumstances that the government perceives to be beneficial to legitimate interests of the executive, which clearly include ongoing criminal investigations. Further, the court knows of no obligation that is placed on the government to reveal to the court, even *ex parte*, that a criminal investigations in ongoing as to any particular defendant. Indeed, disclosure of such investigation to the court *ex parte* could well blur the line between the judiciary and the executive, upsetting the prohibition on the court "assisting the prosecution." Thus, not only did the government have no obligation to inform the court of the ongoing investigation, its decision not to do clearly furthered ethical concerns. See Marshall v. Jerrico, Inc., 446 U.S. 238, 242 (1980).

D.

Fourth, defendant points to what appears to be inaccurate testimony of the case agent before the grand jury. At the hearing, the government sought to meet its burden by calling its case agent. At that time, the government provided counsel for defendant with such agent's grand jury testimony under the *Jencks Act*, 18 U.S.C. § 3500. On cross-examination, defendant was able to show that some of the agent's testimony at the hearing was inconsistent with information he provided when called to testify by the grand jury. While such inconsistencies will certainly be fodder for cross examination at trial, the court, having observed the demeanor of the witness, finds no reason to believe that the witness knowingly provided false testimony before the grand jury. Indeed, the court found the agent to be very forthcoming and candid in his testimony, admitting that after further review some of the information he testified to in the grand jury was not accurate. The court found such explanation to be highly credible. Inaccurate testimony as opposed to perjured testimony is not sufficient to show outrageous government conduct. Instead, a court may dismiss an indictment based on error in the grand jury proceedings when the defendant shows that he has been prejudiced by the irregularity. United States v. Brewer, 1 F.3d 1430, 1433 (4th Cir.1993). Good faith swings and misses by agents and prosecutors in the grand jury do not automatically result in prejudice to a defendant; if it did, there would seldom be a case that survived Due Process analysis as there is no perfect investigation, prosecution, or, for that matter, defense. Here, the errors of the agent were not material to a finding a probable cause by the grand jury and, because those errors were inadvertent, certainly do not support a finding of "outrageous government conduct."

E.

Fifth, defendant argues that he was the victim of selective prosecution because he was the only person involved in the "Heart Break Hotel" operation involving the I-85/Sugar Creek hotel corridor that was thereafter targeted in the "stash house" sting. Defendant Hill's argument is without merit as the doctrine of selective prosecution is inapplicable here:

> [t]o establish a selective-prosecution claim, a defendant must demonstrate that the prosecution 'had a discriminatory effect and that it was motivated by a discriminatory purpose.'

United States v. Olvis, 97 F.3d 739, 743 (4th Cir.1996). Even if it were applicable, it is defendant's burden to establish "both (1) that 'similarly situated individuals of a different race were not prosecuted,' ... and (2) that the decision to prosecute was 'invidious or in bad faith.'" Id. (citations omitted).

Here, defendant's allegations are devoid of any allegation of racial selectivity by law enforcement. Instead, plaintiff bases his claim of selective prosecution on an allegation that he was the only person involved in another investigation who was targeted in this stash house operation. Inasmuch as selective prosecution is inapplicable to the analysis of outrageous conduct and it further appearing that defendant cannot link his prosecution to a discriminatory motive or show a discriminatory effect, the court finds no merit to this contention.

F.

Sixth, defendant has alleged that the government intentionally created a scenario where he would be exposed to enhanced penalties based on large drug amounts and telling him that the stash house would be guarded by armed men, causing him to secure and bring a gun. This appears to be an argument of "sentencing entrapment" as a basis for a claim of outrageous government conduct. The evidence the court heard was that the government believed that the scenario it created

was realistic for the Charlotte cocaine drug market. While counsel for defendant claims that, in his experience, a five kilo stash house is unrealistic, the court's concern is not with counsel's experience or even this court's experience with cases, but whether defendant willfully decided to participate in that scenario. In United States v. Jones, 18 F.3d 1145 (4th Cir. 1994), the Court of Appeals for the Fourth Circuit held:

> Just as it is not outrageous for law enforcement authorities proceeding in an undercover "buy" to attempt to bargain with a seller of narcotics into selling an amount which constitutes a crime for the sole purpose of obtaining a conviction, we find it not outrageous for the government to continue to purchase narcotics from willing sellers even after a level of narcotics relevant for sentencing purposes has been sold. We do not rest our decision upon a finding, as no doubt could be made, that the government had a legitimate purpose in continuing to conduct drug transactions with the appellants over an extended period of time, i.e., the hope of locating, apprehending and convicting Thompson. We decline to impose a rule that would require the government to come forward with a purpose or motivation, other than its responsibility to enforce the criminal laws of this country, as a justification for an extended investigation or for any particular step undertaken as part of an investigation. We also decline to adopt a similar rule that would require district courts to speculate as to the motives of, or to ascribe motives to, law enforcement authorities. Due process requires no such ruminations.

Id. at 1155 (citation and footnotes omitted). In any event, there is no evidence that defendant was anything but a willing participant in the scenario conceived by the government and that defendant well knew what he was getting into when he agreed to rob the stash house.

G.

Seventh, defendant points to the comments from the bench of Honorable David C. Keesler, United States Magistrate Judge, at his bond revocation hearing in the underlying SRV proceeding, which was prompted by defendant's arrest on the stash house robbery. The following exchange occurred between counsel for the government and Judge Keesler at the bond hearing:

10

| | | |
|---|---|---|
| THE COURT: | | All right. Ms. Phillips, do you want to say anything else? |
| MS. PHILLIPS: | | Your Honor, simply to note that while Mr. Thorne was released on bond following his initial hearing, ATF was monitoring his location very closely. |
| THE COURT: | | Okay. I'm restraining myself. I find that shocking. I just am amazed by that decision. But the government's motion to revoke bond is granted. The defendant will be ordered detained pending further proceedings in the case numbered 3:06-cr-448. So I guess that concludes that matter. |

Def. Motion to Dismiss (#74), Def. Ex. 1 (#74-1) at p. 12, lines 6-16. While the law allows federal judges to comment from the bench, this court, while respecting the opinion of Judge Keesler, is not bound or, for that matter, much swayed by the comment. Indeed, review of the initial appearance transcript reveals that such comment was merely an off-the-cuff response to the Assistant United States Attorney's aside that "ATF was monitoring his location very closely" while on bond and in no way reflects that Judge Keesler was addressing the "shocks the conscience" standard applicable to claims for outrageous government conduct.

In any event, the issue is before this court and there is nothing shocking to this court in law enforcement investigating crime by paying close attention to the whereabouts of those they have reason to believe are engaged in criminal activity. Being on bond provides one with no immunity from investigation, police scrutiny, or "close monitoring." There is no allegation that ATF or the government did anything that violated defendant's Fourth Amendment protections in conducting its investigation.

III.

In sum, the government presented evidence that defendant was targeted not for any unlawful or suspect reason, but due to his previous involvement with violent crime in the I-85/Sugar Creek hotel corridor that had apparently gone under the radar. The evidence presented

reveals that the government relied on information provided by a reliable informant, who identified defendant as an individual engaged in armed robberies of "Johns" at hotels. The informant told the government that defendant used *Backpage*, a classified advertising website, and female prostitutes to lure men to hotels, at which point the men were then robbed by defendant. After ATF independently identified defendant, agents reviewed his violent criminal history, which included 2nd Degree Burglary, Larceny of a Firearm, Robbery with a Dangerous Weapon, Attempted 2nd Degree Sex Offense, and a Federal conviction for Possession of a Firearm by Felon for which defendant was still on supervised release. The evidence presented also revealed that defendant was given opportunities to withdraw and that had he balked at bringing a gun to rob the stash house, the ATF undercover would have simply thanked him and walked away.

The court has carefully considered the totality of the circumstances, including the cumulative impact of each discreet claim when those claims are considered together. Here, ATF targeted defendant based on information from a reliable informant, defendant's criminal history revealed a propensity for engaging in violent robberies, and that defendant had carved out a niche of violent criminal conduct that would go unreported to authorities. The court can find no outrageous conduct in the initiation of this investigation as the evidence indicated that it was defendant's propensity for violence and robbery which caused ATF to target him for this scenario.

There is nothing about the details of the undercover operation that was either "outrageous" or "offensive to traditional notions of fundamental fairness" as would warrant the extraordinary remedy of dismissal. Goodwin, 854 F.2d at 37. Indeed, the evidence presented indicated to this court that defendant was not unfairly targeted, that he was not arbitrarily exposed to high amounts of controlled substances or weapons simply to enhance sentencing, that he was not "plied" with

alcohol supplied by the undercover, that defendant was provided with an adequate opportunity to withdraw from the sting, and that the defendant was subjected to an adequate vetting process.

Further, the court can find no authority for the proposition that so as not to offend Due Process, agents must target the "baddest-of- the-bad" or those with the worst criminal records. Futrher, the court can find no authority for the proposition that the scenario presented must be limited to a defendant's past conduct. Instead, the court finds that what is key is whether those targeted in a sting were predisposed to engage in criminal activity, that their will was not overcome by the government, and that they voluntarily participated in all aspects of the scenario. Here, the evidence presented indicated beyond doubt that defendant was ready, willing, and able to commit the stash house robberies imagined by ATF. A due process violation occurs only when the government's conduct, viewed in its totality, is so offensive that it "shocks the conscience." Having considered all the materials and evidence presented, the government presented in this defendant's case, while perhaps offensive to some, does not offend Due Process as the conduct is neither "shocking" nor "offensive to traditional notions of fundamental fairness.

## ORDER

**IT IS, THEREFORE, ORDERED** that defendants' Motion to Dismiss Based on Outrageous Government Conduct (#74) is **DENIED**.

Signed: September 22, 2014

Max O. Cogburn Jr.
United States District Judge